Commonwealth Trust & Savings Bank, Appellee, v. Martha P. Hart, Administratrix of the Estate of Ernest E. Hart, Deceased, Appellant.

Gen. No. 36,083.

Heard in the second division of this court for the first district at the June term, 1932. Opinion filed November 22, 1932. Rehearing denied December 3, 1932.

JOHN S. HUMMER, for appellant; HUMMER & HUMMER, of counsel.

LUCIUS, BUEHLER & LUCIUS, for appellee; ERNST BUEHLER, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On March 31, 1930, plaintiff filed a sworn claim of the 6th class in the probate court of Cook county for $1,900, and certain interest, against the estate of Ernest E. Hart, deceased. Attached to the claim was "a certain Guaranty Agreement, dated September 26, 1927, and executed and delivered by the deceased, and by Simon Hirsh, N. H. Spero and C. S. Kelly." It is stated that the claim is for "liability of Ernest E. Hart, deceased, for the unpaid balance and interest due on an original loan of $3,000, made on March 9, 1928, to William S. Nyman, doing business as Acacia Furniture Co.,—said balance being in the amount of $1,900, . . . and said liability arising from said Guaranty Agreement." Subsequently such proceedings were had in the probate court that the claim was disallowed on February 18, 1931. From this order plaintiff perfected its appeal in the circuit court, where there was a

trial *de novo* of the cause without a jury, resulting in the court on March 12, 1932, making a finding in favor of plaintiff (the claimant) and adjudging that it recover of defendant, Martha P. Hart, as administratrix of said estate, "the sum of $2,070.25, being the amount found due it as aforesaid, together with costs, as a claim of the 6th class, to be paid in due course of administration." From said judgment the present appeal is prosecuted.

In the draft judgment order the circuit court found, *inter alia:*

"That the guaranty agreement sued upon constitutes a general guaranty and an irrevocable one, and that the debt secured thereby was incurred in the lifetime of Ernest E. Hart, deceased, and that the same was not increased but was decreased after his death, and that the renewal notes given to the claimant from time to time did not effect a cancellation of the pending debt."

The Guaranty Agreement, dated September 26, 1927, and signed by the deceased in his lifetime and by the three other individuals, is partly in printed type and partly in typewriting, and is in substance as follows:

WHEREAS, William S. Nyman, having his place of business in Chicago, (hereinafter termed the Borrower), desires to obtain from Commonwealth Trust & Sav. Bank (hereinafter termed the Bank) "loans, discounts, advances, credits, acceptances, *or renewals or extensions thereof* . . . all of which . . . are hereinafter termed 'Credits' or 'Guaranteed Obligations'."

Now THEREFORE the undersigned, in consideration of one dollar, "and of credits to be made by the Bank" to or for the use, benefit or account of the Borrower, "hereby jointly and severally promise, agree and *guarantee* to and with the Bank" as follows:

The Borrower will punctually pay any and all sums, both principal and interest, which he now owes or may

owe to the Bank, "and any *renewals or extensions of the same,* to which renewals or extensions the undersigned expressly assent and agree."

This guarantee is a "guaranty of *payment* by the Borrower and not a guaranty of collection or collectibility." . . . The Bank shall not be required to enforce any rights or pursue any remedies against the Borrower, or upon or against any collateral that may be held by the Bank as security for any guaranteed obligations as a condition precedent to the coming into effect of the liability of any or all of the undersigned, "this obligation to the Bank being absolute and unconditional."

The liability of the undersigned shall in no way be impaired or affected whether at any time the aggregate of the guaranteed obligations is either more or less than the principal amount guaranteed hereunder, or said guaranteed obligations are or are not secured by collateral or otherwise. The undersigned agree that all or any part of such collateral may be exchanged by the Bank for other collateral, and that the Bank may release or surrender to the Borrower any and all such collateral, without notice by the Bank and without the further consent of any of the undersigned, whose liability hereunder shall in no way be impaired or affected by any such exchange, release or surrender.

. . .

The joint and several liability of the undersigned hereunder "shall not at any time exceed the aggregate principal sum of $3,000."

This guaranty "shall apply to all credits heretofore made or made hereafter until this guaranty shall be duly cancelled or terminated *by agreement in writing between the Bank and the undersigned,*" but no such cancellation or termination "shall affect the liability of the undersigned hereunder upon or in respect of credits granted by the Bank prior to such cancellation

or termination, irrespective of the dates of the maturity of such credits.''

The undersigned agree to the terms and provisions of the guaranteed obligations, entered into by the Borrower with the Bank, and as to said obligations, expressly waive (1) demand by the Bank upon the Borrower of payment; (2) notice by the Bank to any or all the undersigned of non-payment by the Borrower; and (3) notice by the bank to any and all the undersigned of sale, upon notice or advertisement of or other realization upon the collateral held by the Bank as security.

The undisputed facts, as disclosed on the trial in the circuit court, are in substance as follows: In September, 1927, when the guaranty agreement was executed and delivered by Ernest E. Hart, and the three other individuals to the plaintiff bank, Hart was its president. William S. Nyman, individually, then was engaged in business in Chicago under the trade name of Acacia Cabinet Shop. On November 16, 1927, the bank loaned Nyman $1,000 on his individual note. On December 10, 1927, the bank loaned Nyman the additional sum of $2,000 on his individual note. Hart acted for the bank in these transactions. The total of the two loans amounted to $3,000, which was the limit of the guarantors' possible liability to the bank at any time, as stated in the guaranty agreement. Thereafter each of these notes was renewed. On March 9, 1928, the two renewed notes being surrendered, Nyman signed a new 90-day note for $3,000, which was several times renewed, less certain small payments which were made thereon by him. In the meantime he had incorporated his business as Acacia Furniture Co., and the renewed notes, payable to the order of the bank, were signed both by Nyman, individually, and by said Furniture Co., by Nyman, its president. On April 4, 1929, the indebtedness on the note had been reduced by $500, and on that day a new 30-day note for $2,500 was exe-

cuted. Before its maturity a further payment of $100 was made on the indebtedness and a new 30-day note for $2,400 was executed on May 3, 1929. Before its maturity, Hart died on May 15, 1929, of whose death the bank had immediate knowledge or notice. Thereafter further small payments were made from time to time on the indebtedness, and the note, less the payments, was successively renewed on several occasions, without the consent of or notice to the legal representative of Hart's estate. On March 31, 1930, when the bank's claim against Hart was filed in the probate court, the bank had in its possession the joint note of Nyman and the Acacia Furniture Co. for $1,900, dated February 1, 1930, payable 45 days after date to the order of the bank. On the hearing in the circuit court it appeared that there was unpaid on said note, and on the original indebtedness of Nyman to the bank, the sum of $1,818.19, plus interest, etc., or a total sum of $2,070.25, for which amount the judgment appealed from was entered.

In 1 Brandt on Suretyship & Guaranty, 3rd Ed., p. 230, sec. 106, it is said: "A rule never to be lost sight of in determining the liability of a surety or guarantor is, that he is a favorite of the law and has a right to stand upon the strict terms of his obligation, when such terms are ascertained." In *Phoenix Mfg. Co. v. Bogardus,* 231 Ill. 528, 531, it is said: "The law is well settled that the undertaking of a surety is to be strictly construed and his liability not to be extended by construction. The liability of guarantors is governed by the same rules." In 12 Ruling Case Law, p. 1053, sec. 1, a "guaranty" is defined to be "a promise to answer for the payment of some debt or the performance of some obligation, on default of such payment or performance, by a third person who is liable or expected to become liable therefor in the first instance." In *National Eagle Bank v. Hunt,* 16 R. I. 148, 151, 152, it is said:

"Guaranties have been divided into two classes: One where the consideration is entire, that is, where it passes wholly at one time; the other where it passes at different times, and is, therefore, severable or divisible. The former are not revocable by the guarantor, and are not terminated by his death and notice of that fact. (Citing cases.) The latter, on the contrary, may be revoked as to subsequent transactions by the guarantor, upon notice to that effect, and are determined by his death and notice of that event." (Citing cases.)

The distinction between these two classes of guaranties is well illustrated by Lush, Lord Justice, in *Lloyds v. Harper,* L. R. 16 Ch. Div. 290, 319. "An instance of the first," he remarks, "is where a person enters into a guaranty that, in consideration of the lessor granting a lease to a third person, he will be answerable for the performance of the covenants. The moment the lease is granted there is nothing more for the lessor to do, and such a guaranty as that of necessity runs on throughout the duration of the lease. The lease was intended to be a guaranteed lease, and it is impossible to say that the guarantor could put an end to the guaranty at his pleasure, or that it could be put an end to by his death, contrary to the manifest intention of the parties. . . .

"Instances of the second class are more familiar. They are where a guaranty is given to secure the balance of a running account at a banker's, or a balance of a running account for goods supplied. There the consideration is supplied from time to time, and it is reasonable to hold, unless the guaranty stipulates to the contrary, that the guarantor may at any time terminate the guaranty. He remains answerable for all the advances made or all the goods supplied upon his guaranty before the notice to determine it is given; but at any time he may say, 'I put a stop to this; I do not intend to be answerable any further; therefore do not make any more advances or supply any more

goods upon my guaranty.' As at present advised, I think it quite competent for a person to do that where, as I have said, the guaranty is for advances to be made or goods to be supplied, and where nothing is said in the guaranty about how long it is to endure. In that case, as at present advised, I cannot entertain a doubt that the judgment of Mr. Justice Bowen, in *Coulthart v. Clementson*, L. R. 5 Q. B. Div. 42, is perfectly right, that notice of the death of the guarantor is a notice to terminate the guaranty, and has the same effect as a notice given in the lifetime of the guarantor that he would put an end to it.''

We think it clear that the guaranty agreement in the present case is of the second class of guaranties, as defined in *National Eagle Bank v. Hunt, supra*. And we think it is also to be construed as a ''continuing guaranty,'' as defined in the text books. (See illustrations of such guaranties in 1 Brandt on Suretyship & Guaranty, 3rd ed., secs. 175–177, pp. 357–61.) In 28 Corpus Juris, sec. 13, p. 897, it is said:

''A continuing guaranty is one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, generally for an indefinite time; and hence where the continuance of a guaranty is expressly limited, it is not a continuing guaranty. It is prospective in its operation and is generally intended to provide security in respect to future transactions within certain limits, and contemplates a succession of liabilities, for which, as they accrue, the guarantor becomes liable.''

Inasmuch as it appears from the evidence in the present case that all loans or advances by the bank to the borrower (Nyman) were made *after* the execution of the guaranty agreement by the four signers (including Hart), only the salient *prospective* features of the instrument need be considered. They are in substance (a) that the signers guarantee the punctual payment to the bank of any and all sums of money

which the borrower (Nyman) may owe to the bank, "or any *renewals or extensions of the same,* to which renewals or extensions the undersigned expressly assent and agree"; (b) that the guaranty is one "of payment by the borrower" and not one "of collection or collectibility"; (c) that the joint and several liability of the signers "shall not at any time exceed the aggregate principal sum of $3,000"; (d) that the guaranty applies to all loans or credits "made hereafter," until the guaranty shall be canceled or terminated "by agreement in writing between the bank and the undersigned"; (e) that, however, in case of a cancellation or termination in this manner, the liability of the signers shall not be affected "upon or in respect of credits granted by the bank prior to such cancellation or termination, irrespective of the dates of the maturity of such credits." It is especially to be noticed that no particular termination time of the guaranty is stated; it is to be continued in force for an *unlimited* time, save that it may be canceled and terminated by an "agreement in writing between the bank and the undersigned" (i. e., all four of them, including Hart).

A somewhat similar guaranty agreement, relative to merchandise to be sold in the future, was under consideration in the case of *Jordan v. Dobbins,* 122 Mass. 168. It there appears that in February, 1873, William Dobbins executed and delivered a guaranty agreement to Jordan, wherein Dobbins guaranteed to Jordan "the prompt payment by George E. Moore to Jordan, at maturity, of all sums of money and debts which he may hereafter owe Jordan for merchandise, which Jordan may from time to time sell to him, whether such debts be on book account, by note, draft or otherwise, and also *any and all renewals of any such debt,*" and wherein it was provided that Dobbins should not be compelled to pay on the guaranty a sum exceeding

$1,000; that the guaranty should be a continuing one, and that it should "apply to and be available to Jordan for all sales of merchandise made to Moore *until written notice shall have been given* by the undersigned (Dobbins) to Jordan, and received by Jordan, *that it shall not apply to future purchases.*" It further appears that thereafter Jordan, relying on the guaranty agreement, sold and delivered to Moore, between January 16 and May 28, 1874, certain merchandise which he had not paid for; that other similar merchandise had been sold and delivered to Moore between the date of said guaranty and January 16, 1874, which he had paid for; that Dobbins had died in August, 1873; that in September, 1873, Elizabeth Dobbins was appointed administratrix of his estate; that Jordan had had no notice of Dobbins' death until after all the unpaid for merchandise had been sold and delivered to Moore; that suit was brought by Jordan against the administratrix of Dobbins' estate on the guaranty to recover for the value of the unpaid for merchandise, which had been sold and delivered to Moore; and that in the trial court Jordan had recovered a judgment against Dobbins' estate. In reversing the judgment and in entering judgment for the estate, the Supreme Court of Massachusetts said in part (p. 170, italics ours):

"An agreement to guarantee the payment by another of goods to be sold in the future, not founded upon any present consideration passing to the guarantor, is a contract of a *peculiar character*. Until it is acted upon, it imposes no obligation and creates no liability of the guarantor. After it is acted upon, the sale of the goods upon the credit of the guaranty is the only consideration for the conditional promise of the guarantor to pay for them. The agreement which the guarantor makes with the person receiving the guaranty is not that I now become liable to you for any-

thing, but that if you sell goods to a third person, I will then become liable to pay for them if such third person does not. It is of the nature of an authority to sell goods upon the credit of the guarantor, rather than of a contract which cannot be rescinded except by mutual consent. Thus such a guaranty *is revocable* by the guarantor at any time *before it is acted upon.* . . .

"Such being the nature of a guaranty, we are of the opinion that the death of the guarantor operates as a revocation of it, and that the person holding it cannot recover against his executor or administrator for goods *sold after the death*. Death terminates the power of the deceased to act and revokes any authority or license he may have given, if it has not been executed or acted upon. His estate is held upon any contract upon which a liability exists at the time of his death, although it may depend upon future contingencies. But it is not held for a liability which is created after his death, by the exercise of a power or authority which he might at any time revoke.

"Applying these principles to the case at bar, it follows that the defendant is entitled to judgment. The guaranty is . . . in its nature nothing more than a simple guaranty for a proposed sale of goods. The provision, that it shall continue until written notice is given by the guarantor that it shall not apply to future purchases, affects the mode in which the guarantor might exercise his right to revoke it, but *it cannot prevent its revocation by his death.*"

There is apparently a conflict in the authorities in this country as to whether in a continuing guaranty the death of the guarantor *ipso facto* terminates the guaranty, or whether it is terminated only upon notice of that fact received by the person to whom the guaranty was made. (*American Chain Co. v. Arrow Grip Mfg. Co.*, 235 N. Y. S. 228, 234; annotated note in 42 A. L.

R. pp. 926–936.)   In the present case this conflict is of
no importance, as it is undisputed that the bank had
immediate notice of Hart's death on May 15, 1929.

The main controversy in the present case arises be-
cause of the clause in the agreement that the signers
(including Hart) guarantee that "the borrower (Ny-
man) will punctually pay any and all sums which he
may owe to the bank, *and any renewals or extensions*
*of the same,* to which renewals or extensions the under-
signed expressly assent and agree."   Counsel for
plaintiff contend in substance that when the plaintiff
bank accepted renewal notes from Nyman *after* notice
of Hart's death, no *new* indebtedness thereby was cre-
ated, and consequently Hart's estate was not released
from liability, even though the renewal notes were
given and accepted without the consent or knowledge
of the legal representative of Hart's estate.   Counsel
for the estate, however, contend that said acts should
operate as a release of the estate from liability on the
indebtedness represented by the notes.   And they ar-
gue in substance that if the plaintiff bank be permitted
to extend the indebtedness in this manner, without the
consent or knowledge of the legal representative of
Hart's estate, it could continue to make further ex-
tensions and thereby subject the estate to liability *for*
*an indefinite period* and prevent an early settlement
of Hart's estate as contemplated by the Administra-
tion Act, Cahill's St. ch. 3, and, furthermore, that the
estate might thereby be prevented from enforcing its
right of contribution from Hart's coguarantors in the
guaranty agreement.

In support of their contention and argument counsel
for the estate refer to the decisions and holdings in
*Home Nat. Bank v. Estate of Waterman,* 30 Ill. App.
535 (affirmed in 134 Ill. 461) ; *Gay v. Ward,* 67 Conn.
147, and other cases.   The *Waterman* case was con-
sidered in the Appellate Court for the second district

of Illinois on appeal from an order of the circuit court of Kane county disallowing the large claim of the bank against the Waterman estate. Waterman, in his lifetime, together with several other stockholders of a Harvester Co., had subscribed to a contract of guaranty dated August 10, 1882, wherein they guaranteed the payment to the bank "on or before March 1, 1883, such proportion of our company's debt, or any extension thereof made in the meantime, in cash, as said farmers' notes are held to secure." Four extensions of the indebtedness were made before July 19, 1883, on which date Waterman died. *Three extensions were made thereafter.* The procedure in each case was to cancel the matured note and accept a renewal note in lieu thereof. The Appellate Court held in substance that the power of the bank to extend or renew the note was revoked by Waterman's death and that the extensions and renewals made thereafter released his estate from liability, and affirmed the judgment of the circuit court in disallowing the bank's claim against said estate. The court said in the majority opinion (30 Ill. App. 548, 549):

"It is contended by appellant that, as the agreement speaks of a possibility of renewal, it gave authority to the Harvester Co. and appellant to renew without additional consent of Waterman. Without stopping to inquire what the true interpretation would be if Waterman had been alive when the three last renewals were made, we understand the law to be that any power of that description would be revoked by the death of the party giving it. The death of Waterman worked a revocation of any authority to extend the time of payment of the original debt that may have existed prior to that time. . . .

"Taking the case as a whole, we must hold that Waterman, on account of the extensions of the time of payment, and the taking new notes from the Harvester

Co. and delivering up the old ones to the original debtor after Waterman's death and without appellees' consent, releases the latter, as executor of Waterman's estate, from the obligation as surety."

The decision of the Appellate Court was reviewed and affirmed by our Supreme Court, as above stated. In the course of the opinion the court said (134 Ill. 467):

"Even if we assume, for the purposes of the decision, that the agreement contemplated renewals of the notes of the Harvester Company, and extensions of the time for the payment of the same, and that the necessity of procuring further consent of Waterman for the making of such renewals and extensions was thereby obviated, yet it is manifest that his death revoked all authority given by him in that behalf,—and the record shows that several renewals of the notes were made after his decease."

In the Connecticut case above referred to (*Gay v. Ward,* 67 Conn. 147) the litigation arose on "a contract of continuing guaranty in the form of a bond," signed by several stockholders of a Manufacturing Company, to a bank in Hartford, Conn. The signers guaranteed to the bank "the full, prompt and ultimate payment" of all commercial paper which the bank may "have discounted or may hereafter discount . . . to an amount not to exceed $15,000 in all at any one time." It was provided in the instrument that upon notice to the bank by one or all of the guarantors, such guarantor or guarantors should not be holden upon the bond for any liability created by the company subsequent to the giving of such notice. From the date of the bond to February 9, 1888, the bank discounted commercial paper of the company, upon which date the company failed. In January, 1889, the bank recovered a judgment against the executors of Gay, one of the guarantors, in the amount of about $11,000, which the execu-

tors of Gay paid. Subsequently one Wadsworth, another guarantor, voluntarily paid to the executors of Gay one-half of said amount. Thereafter the action for contribution was brought by the executors of Gay and of Wadsworth against the respective administrators of the estates of one Ward and one Cowles (each a signer of the instrument during his lifetime) and others. The case reached the Supreme Court of Connecticut upon the request for an advisory opinion, and the Supreme Court advised the lower court "to render judgment in favor of the defendants." It further appeared that Ward died in April, 1883, and his estate was settled in December, 1883; that Cowles died in 1873, and his estate was settled in June, 1873; that all of the discounts, which existed on February 9, 1888, and which the estate of Gay and Wadsworth paid, were made by the bank *long subsequent* to the death of Cowles and none was a renewal of a discount made in his lifetime; that $5,000, of said $11,000, were discounts made by the bank *after having notice* of Ward's death, and $6,000, of said $11,000, were *renewals of paper* made after notice of Ward's death, but of paper originally discounted prior to Ward's death; that the bank, Gay and Wadsworth had immediate notice of the death of Cowles and of Ward; and that the Manufacturing Company was solvent at the times of the deaths of Cowles and Ward. In the course of the opinion the Supreme Court of Connecticut said (pp. 159, 160, italics ours):

"The duty of the bank upon this bond, if it desired to hold the estate of Ward liable, was to enforce its claim upon the paper existent at Ward's death, against his estate. Instead of this, the bank renewed and extended its discounts, taking new paper for the old, without the knowledge or acquiescence of the representatives of Ward. Thereafter the bank must look to the remaining guarantors upon the bond; it waived its

right to enforce payment from the estate of Ward, when it accepted paper in renewal of the old. Each renewal of the old paper constituted payment of the old paper, so far as Ward's estate was concerned. Each renewal so made had, for its security, the guaranty of the living guarantors upon the bond, who had not notified the bank of the termination of their liability upon the guaranty. . . .

"The claim that, because the bond of guaranty in this case bound the guarantors to the 'full, prompt and ultimate payment' of all paper discounted after the execution of such bond, therefore the guaranty covers discounts made before the death, *and renewals* of such discounts made *after the death* of the guarantor, cannot be sustained. The guaranty here applies to paper discounted, and to the renewal or extension of such discounts, *before the decease of a guarantor.* Otherwise a continuing liability existed against the estate of the deceased guarantor *so long as the renewals were made.* Such a result was not intended by the parties to the bond. They did not intend to continue a liability after the death of a guarantor, *for an indefinite period,* which he and they could terminate at any time during his life. A contract of guaranty is to be construed so as to promote the use and convenience of commercial intercourse. . . . And its language is not to be extended by any strained construction, for the purpose of enlarging the guarantor's liability. . . . But its construction is to be according to what is fairly to be presumed to have been the understanding of the parties, without any strict technical nicety. . . . These established rules of construction accord with the construction we give to the guaranty before us.''

Counsel for the bank in the present case place considerable reliance upon the holdings and decision in *Exchange Nat. Bank of Spokane v. Hunt,* 75 Wash.

513, to sustain their position that the judgment appealed from should be affirmed. We think that case can be distinguished in its facts from the present case. But, if not, we think that the decision is contrary to the holdings and decisions of our Supreme Court in the *Waterman* case, *supra,* and contrary to the general current of authority.

After a careful reading of the guaranty agreement in the present case, and after considering the undisputed facts, the well settled principles of the law relating to guaranties and the authorities above cited and discussed, we have reached the conclusion that the circuit court erred, as a matter of law, in entering the judgment appealed from, and that the probate court was right in originally disallowing the bank's claim against the Hart estate. Accordingly, the judgment of the circuit court of March 12, 1932, is reversed, and judgment for costs is entered here in favor of the defendant and against the plaintiff, Commonwealth Trust & Savings Bank.

*Reversed with judgment here.*

KERNER, P. J., and SCANLAN, J., concur.