SIXTH DIVISION
September 22, 2006

No. 1-05-3235

CCP LIMITED PARTNERSHIP, the Estate of )   Appeal from the
MERRILL KIRSCH, ANTHONY KIRSCH, PATRICK )   Circuit Court of
KIRSCH and CATHERINE KIRSCH,            )   Cook County
                                        )
        Plaintiffs-Appellees,           )
                                        )
    v.                                  )
                                     )
FIRST SOURCE FINANCIAL, INC.,           )
                                        )
        Defendant-Appellant,            )
_____)
                                        )
FIRST SOURCE FINANCIAL, INC., a Delaware)
corporation, and SPECIAL SITUATIONS     )
OPPORTUNITY FUND I, LLC, a Delaware      )
limited liability company,              )
                                        )
        Plaintiffs-Appellants,          )
                                        )
    v.                                  )
                                        )
CCP LIMITED PARTNERSHIP, a Wisconsin    )
limited partnership, and CEDAR CREEK    )
PARTNERS, LLC, its General Partner,     )
                                        )
        Defendants-Appellees,           )
_____)
                                        )
FIRST SOURCE FINANCIAL, INC., a Delaware)
corporation, and SPECIAL SITUATIONS     )
OPPORTUNITY FUND I, LLC, a Delaware      )
limited liability company,              )
                                        )
        Plaintiffs-Appellants,          )
                                        )
    v.                                  )
                                        )
ESTATE OF MERRILL KIRSCH, ANTHONY       )
KIRSCH, PATRICK KIRSCH and CATHERINE    )
KIRSCH,                                 )   Honorable
                                        )   David Donnersberger,
        Defendants-Appellees.           )   Judge Presiding


        JUSTICE McNULTY delivered the opinion of the court:

        This case involves the proper characterization of a contract

between a bank and several individuals who owned a corporation that took a series of loans from the bank. The bank claims that the owners in the contract purchased parts of the loans the bank made to the corporation, effectively using the bank as a vehicle to loan their corporation their money. When the corporation defaulted on some of the loans, the owners, as participating lenders, lost their investments in the loans. The bank sought to recover from the owners the amounts they agreed to lend their corporation.

The trial court held that the contract created a continuing guaranty of the series of loans, and the owners validly revoked the guaranty in 2003. Because the corporation did not default on loans made prior to the revocation date, the owners did not owe the bank anything on the guaranty. The trial court awarded the owners summary judgment against the bank. We agree with the trial court's characterization of the transaction and the finding of a valid revocation. Therefore, we affirm the trial court's judgment.

BACKGROUND

Catherine, Patrick, Anthony and Merrill Kirsch owned shares of Capatony, Inc. Capatony owned 45% of Dart Distributing, LLC, while CCP Limited Partnership owned the remaining 55%. Anthony and Merrill also served on Dart's board of directors. In November 1997, First Source Financial (FSFP) agreed to loan Dart some funds. The following year, Dart sought additional loans to

fund its ongoing operations. Dart agreed to secure the revolving loans by giving FSFP an interest in most of its property. The loan agreement included a formula for computing the total amount of outstanding revolving loans Dart could accumulate. The parties referred to the prescribed maximum loan total as the "Borrowing Base."

Dart's needs soon exceeded the Borrowing Base. FSFP agreed to loan Dart further funds, but it sought to protect itself by spreading the risk from the loans. In September 2000 Dart and FSFP signed a "Second Amendment" to the revolving loan agreement, increasing the amount of revolving loans FSFP would allow Dart to accumulate. The parties agreed that the increased loans depended upon a "Last-Out Participation Agreement" (the LOPA) between CCP, the Kirsches, and FSFP.

The LOPA lists CCP and the Kirsches as "Participants" in the loans to Dart. It provides:

"WHEREAS, each of the Participants acknowledges that (i) the effectiveness of the Second Amendment is expressly conditioned upon, and FSFP has entered into the Second Amendment in reliance upon, each Participant's execution and delivery of this Agreement and (ii) each Participant will derive substantial benefit and advantage from the financial accommodations made available to [Dart] in the Second Amendment; ***

          ***

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, FSFP and each of the Participants hereby agree as follows:

\*\*\*

\*\*\* FSFP hereby sells to each Participant, and each Participant hereby purchases from FSFP, \*\*\* a subordinated secured participation interest \*\*\* in the Loans. \*\*\* The Purchase Amount of each Participant shall be due and payable by such Participant within 10 days after the date \*\*\* that such Participant receives written notice from FSFP that (i) an Event of Default under the Credit Agreement has occurred and is continuing and (ii) the Revolving Loans have been accelerated and are due and payable in full (the date of such acceleration being referred to as the 'Determination Date').

\* \* \*

\*\*\* [N]one of the Participants shall be entitled to the payment in cash of accrued interest hereunder until the indefeasible payment in full in cash to FSFP of all Liabilities owing to FSFP under the Credit Agreement, in accordance with Section 6 below.

6. <u>Allocation of Payments</u>. All payments received by [FSFP] from time to time on account of the Loans shall be applied in the following order: (a) <u>first</u>, to

FSFP, for (i) all costs ***; (ii) all accrued interest
***; (iii) all principal *** and (iv) any other
Liabilities owing to FSFP ***; and (b) after all
amounts described in clause (a) above shall have been
indefeasibly paid in full in cash to FSFP, then, to
Participants ***.  The Participants shall bear all
losses up to the amount of their *** Participations
that may be sustained before FSFP shall bear any loss."
(Emphasis in original.)

Catherine, Patrick, Anthony and Merrill each owned a brokerage account with Lowry Hill.  Each of the Kirsches signed a "Pledge and Security Agreement" in favor of FSFP.  In all four agreements FSFP acquired a security interest in the pledgor's brokerage account with Lowry Hill, payable if the pledgor failed to fulfill his duties under the LOPA.

In January 2003 CCP and the Kirsches sent a letter to FSFP in which they said:

"The current Purchase Amount for the *** Participation
of each Participant, calculated by reference to the
attached Borrowing Base Certificate, is $0.
Accordingly, each of the undersigned Participants
hereby revokes the Participation Agreement and all of
their respective debts, obligations and liabilities
thereunder.  None of the undersigned Participants will
be liable for any loans, advances or any additional

credit extended by [FSFP] under the Credit Agreement at any time after the date hereof."

The Kirsches also notified Lowry Hill of their revocation of the LOPA and the pledges and security agreements.

Merrill Kirsch died and the administrator of his estate took over the management of his finances. In December 2003, two members of the Kirsch family and Robert Cook, managing director of CCP's general partner, asked FSFP to lend additional funds to Dart. In April 2004 Catherine, Patrick and Anthony sent FSFP a letter reminding FSFP that the Kirsches had revoked the LOPA. Cook and some of the Kirsches returned to FSFP seeking more loans for Dart in June 2004.

On January 26, 2005, FSFP notified the Participants in the LOPA that Dart had defaulted and therefore FSFP declared the "Determination Date" for the LOPA had arrived. According to FSFP, the Participants owed it $1 million apportioned amongst the Participants in the manner set forth in the LOPA. When the Participants refused to pay, FSFP recovered $450,000 directly from Lowry Hill under the pledges the Kirsches signed.

On April 8, 2005, the Kirsches and CCP sued FSFP, seeking a judgment declaring that the Kirsches and CCP validly revoked the LOPA in 2003 and that FSFP had no right to the money it took from the Lowry Hill accounts. Also on April 8, 2005, FSFP sued CCP for its portion of the $1 million FSFP sought to recover under the LOPA. A few days later FSFP sued the Kirsches, seeking a

judgment declaring that FSFP had the right to take the $450,000 it had already taken from the Lowry Hill accounts.  The circuit court granted the parties' motion to consolidate the three cases.

All parties moved for summary judgment.  FSFP admitted that in January 2003, when the Kirsches and CCP sent the revocation letter, the total revolving loans outstanding to Dart did not exceed the Borrowing Base.  Under the formula in the LOPA, if FSFP had then declared the Determination Date, the Kirsches and CCP would owe nothing.  FSFP could not declare a Determination Date at that time, however, because no default had occurred. After FSFP received the revocation letter, it continued lending Dart funds in excess of the Borrowing Base.

Both CCP and FSFP supported their summary judgment motions with documents purporting to reflect e-mails sent between FSFP and Dart.  For FSFP, Robert Palmer swore in an affidavit:

> "The e-mails attached *** have been maintained in the ordinary course of business in [FSFP's] computer system, and I assisted in retrieving them for use in this matter."

Cook similarly swore that the e-mails attached to CCP's motions for summary judgment were "maintained in the ordinary course of business in CCP[']s *** computer system."  Neither affiant said anything about his participation in the correspondence or the occasion for receipt of the e-mail.

The trial court held that the LOPA was, in effect, a

continuing guaranty, revocable on due notice.  The notice the Kirsches and CCP provided in January 2003 effectively revoked the continuing guaranty.  The court entered summary judgment against FSFP and its affiliated parties on all three complaints.  FSFP now appeals.

ANALYSIS

We review *de novo* the grant of summary judgment.  <u>Delaney v. McDonald's Corp.</u>, 158 Ill. 2d 465, 467 (1994).

FSFP contends the LOPA is a participation agreement that gave the Participants no right to revoke prior to the Determination Date FSFP chose.  CCP and the Kirsches answer that the LOPA is a continuing guaranty, and Illinois common law gives guarantors the right to revoke such a continuing guaranty at any time.

"[T]he trial court, in the exercise of its equitable powers, *** will look through the forms to the substance of a transaction in order to ascertain the relationship of the parties."  <u>Tilley v. Shippee</u>, 12 Ill. 2d 616, 623 (1958).  Illinois courts have exercised this power in cases involving loans (<u>Andrews v. Cramer</u>, 256 Ill. App. 3d 766, 770 (1993)), securities (<u>Boatmen's Bank of Benton v. Durham</u>, 203 Ill. App. 3d 921, 927 (1990)), and secured transactions presented in the form of sales (<u>Turk v. Wright & Babcock, Ltd.</u>, 174 Ill. App. 3d 139, 142 (1988)).  We apply the same principles to determine whether the LOPA has the effect of a loan participation or a continuing guaranty.

"A participation agreement is a shared loan where a lead financial institution divides and sells to other banks portions of a loan it has made."  Bank of Chicago v. Park National Bank, 266 Ill. App. 3d 890, 897 (1994).  A participant in a loan, like any lender, accepts the risk of loss in exchange for the promise of the payment of interest.  See D. Threedy, Loan Participations -- Sales or Loans?  Or Is That the Question?, 68 Or. L. Rev. 649, 649-50 (1989).  An Illinois court has defined a guaranty as "'a promise to answer for the payment of some debt or the performance of some obligation, on default of such payment or performance, by a third person who is liable or expected to become liable therefor in the first instance.'" Commonwealth Trust & Savings Bank v. Hart, 268 Ill. App. 322, 327 (1932), quoting 12 Ruling Case Law 1053.  A guaranty reduces the lender's risk by shifting the risk to a party who "has a comparative advantage in monitoring or enforcement" of the debtor's duties, while the "lender has a comparative advantage in liquidity."  A. Katz, An Economic Analysis of the Guaranty Contract, 66 U. Chi. L. Rev. 47, 113 (1999).

Here, the terms of the LOPA clarify that the Participants do not seek to profit from the payment of interest.  The agreement expressly provides that the Participants expect to benefit from the financial accommodation made to Dart, as all of the Participants have ownership interests in Dart.  The Participants, by virtue of their ownership of Dart and their positions as

officers of Dart, had considerable advantage over FSFP in the monitoring and enforcement of the contractual duty to repay the revolving loans.  FSFP had a comparative advantage in liquidity.

Most significantly, the Participants have no right to receive any interest, and no duty to put up funds for the loan, unless Dart defaulted on the revolving loans.  At that point, the Participants' prospects for recovering their investments would be slim enough, and their chances for receiving any interest on their loan participations would be, at best, very remote.  If Dart paid all its debts, the Determination Date would never arrive.  Thus, the Participants would not have any duty to pay their shares of the loan, and they would have no right to receipt of any interest.

We find the transaction in this case comparable to the transaction at issue in Grojean v. Commissioner of Internal Revenue, 248 F.3d 572 (7th Cir. 2001).  In that case Grojean formed a corporation and sought a loan from a bank to fund the corporation's activities.  The bank loaned $10 million to the corporation on condition that Grojean purchase a $1.2 million participation in the loan.  Grojean, 248 F.3d at 572-73.  Grojean took a personal loan from the same bank to purchase the loan participation.  If the corporation paid all its debts, Grojean would reap no gain from the loan participation, because the interest he paid on the personal loan would exactly offset the interest he would receive as a loan participant.  If the

corporation defaulted, the bank retained the right to the return of its entire loan to the corporation and all interest and costs before Grojean could recoup any part of his $1.2 million participation in the loan.  The court recharacterized the contract, ostensibly a loan participation agreement, as a guaranty of $1.2 million of the total amount loaned to the corporation.  Grojean, 248 F.3d at 574.

The LOPA here similarly has the effect of a guaranty.  As long as Dart makes all necessary payments on the loan, the Participants receive no interest and they pay nothing for their nominal participation in the loan.  If Dart defaults, the Participants will lose the entire price set by the LOPA for the nominal participation before FSFP loses any part of its principal or interest earned on the revolving loans to Dart.  Because the LOPA covered an indefinite series of revolving loans, the trial court correctly characterized the LOPA as a continuing guaranty.  See Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 117 (2d Cir. 1998); Commonwealth Trust, 268 Ill. App. at 328-29.

Under English common law, long ago adopted in Illinois, a guarantor of a continuing guaranty has the right to revoke the guaranty at any time, as long as he provides proper notice to the lender.  Mamerow v. National Lead Co., 206 Ill. 626, 634-35 (1903); National Eagle Bank v. Hunt, 16 R.I. 148, 150, 13 A. 115, 116 (1888).  Unless the contract for a continuing guaranty expressly limits the right to revocation, the guaranty remains

subject to the right to revoke.  See <u>City National Bank of Murphysboro v. Reiman</u>, 236 Ill. App. 3d 1080, 1088-89 (1992) (contract for continuing guaranty had no provision concerning revocation; court found guarantor retained right to revoke). "When a guaranty is revoked, a guarantor's liability extends only to transactions occurring pursuant to the guaranty before notice of revocation."  <u>Reiman</u>, 236 Ill. App. 3d at 1090.

Here, the contract did not include any express limitation on the right of revocation.  FSFP received proper notice of the exercise of the right to revoke the guaranty in January 2003.  At that time it had no loans outstanding to Dart in excess of the Borrowing Base.  Thereafter it extended new loans to Dart in excess of the Borrowing Base.  Under the general rule of revocability, FSFP has no right to recover from the Participants for the default on the loans made after the Participants exercised their right to revoke.

FSFP claims that its affirmative defenses of estoppel and unclean hands should have precluded summary judgment.  First FSFP notes that in December 2003 and June 2004, long after the revocation, officers of Dart, including some of the Participants, specifically requested new loans to Dart.  FSFP presented no evidence that at the time of the request the Participants guaranteed repayment of the loans Dart sought.  We do not see how Dart's request for new loans affects the prior revocation of the continuing guaranty.

FSFP primarily relies on several pieces of paper it attached to its motion for summary judgment.  FSFP claims that the documents reflect e-mails one of the Participants sent to FSFP.

On a motion for summary judgment the court must not consider any evidence that would be inadmissible at trial.  <u>Watkins v. Schmitt</u>, 172 Ill. 2d 193, 203-04 (1996).  Without proper authentication no document is admissible.  See <u>Olaf v. Christie Clinic Ass'n</u>, 200 Ill. App. 3d 191, 195 (1990).  An affidavit may provide the authentication needed to make a document admissible.  <u>North American Old Roman Catholic Church v. Bernadette</u>, 253 Ill. App. 3d 278, 286 (1992).  To make documents admissible, the proponent must present evidence "to demonstrate that the document is what its proponent claims it to be." <u>Anderson v. Human Rights Comm'n</u>, 314 Ill. App. 3d 35, 42 (2000).  Either direct or circumstantial evidence can authenticate a document.  <u>People v. Downin</u>, 357 Ill. App. 3d 193, 203 (2005).  Usually the proponent establishes the identity of the document "through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact, what its proponent claims it to be."  <u>Kimble v. Earle M. Jorgenson Co.</u>, 358 Ill. App. 3d 400, 415 (2005).

Palmer swore in an affidavit that the papers attached to the summary judgment motion "have been maintained in the ordinary course of business in [FSFP's] computer system."  At most, the evidence could show that FSFP kept copies of the documents in the

regular course of its business. FSFP did not present any direct evidence of authentication, as it had no affidavit or deposition of the putative author of the alleged e-mail. See Kimble, 358 Ill. App. 3d at 416. Palmer's affidavit includes no evidence that Palmer had any personal knowledge regarding FSFP's receipt of the e-mail. He knew only that at some time before he helped retrieve the message, someone somewhere entered into FSFP's computers a message that listed an officer of Dart on the line for the sender. No evidence limits the time of the creation of the message. Nor does the evidence limit the possible authors. Palmer's affidavit includes no evidence of an ongoing correspondence that might provide circumstantial evidence of the authorship of the message. See Downin, 357 Ill. App. 3d at 203-04. In the absence of proper authentication, this court must ignore the papers purporting to represent e-mails FSFP received from Dart. See Cincinnati Insurance Co. v. Argubright, 151 Ill. App. 3d 324, 328-29 (1986). We note that e-mails similarly appended to the Participants' motion for summary judgment seem to suffer from the same lack of authentication.

Because FSFP did not present any authentication evidence needed to make the purported e-mails admissible, it has no evidence to support its affirmative defenses of estoppel and unclean hands. The affirmative defenses do not defeat the Participants' right to summary judgment.

Finally, FSFP in its reply brief introduces a new argument,

that the Participants waived their right to revoke the LOPA. Under Supreme Court Rule 341(g), we should ignore any new issues raised in the reply brief but not mentioned in the opening brief. 188 Ill. 2d R. 341(g); <u>Tivoli Enterprises, Inc. v. Brunswick Bowling & Billiards Corp.</u>, 269 Ill. App. 3d 638, 642 (1995). Accordingly, we do not address the argument that the Participants waived the right to revoke the LOPA.

The trial court correctly identified the LOPA as a continuing guaranty. Because the LOPA included no explicit limit on the right to revoke, the Participants retained the right to revoke at any time, with due notice to FSFP. They validly exercised that right in January 2003, thereby saving themselves from liability as guarantors for any subsequent loans to Dart. For its affirmative defenses of estoppel and unclean hands, FSFP relied on papers it attached to its motion for summary judgment. But the affidavits FSFP presented failed to authenticate the documents. The court must ignore the inadmissible documents for this summary judgment motion. The trial court correctly rejected the affirmative defenses. Therefore, we affirm the summary judgment granted against FSFP in all three cases.

Affirmed.

FITZGERALD SMITH, P.J., and O'MALLEY, J., concur.