No. 2-09-0134     Filed: 3-23-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MUELLER INDUSTRIES, INC., and B AND K INDUSTRIES, INC., | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiffs and Counterdefendants-Appellees, | ) ) ) ) | |
| v. | ) ) | No. 07--L--567 |
| PETER D. BERKMAN and JEFFREY A. BERKMAN, | ) ) ) ) | |
| Defendants and Counterplaintiffs-Appellants | ) ) ) ) | |
| (William O'Hagan, Greg Christopher, Robert Hodes, Nicholas Moss, Harvey L. Karp, Alexander P. Federbush, Gennaro J. Fulvio, Gary S. Gladstein, and Terry Hermanson, Counterdefendants-Appellees; Homewerks Worldwide LLC, Counterplaintiff). | ) ) ) ) ) ) ) ) | Honorable Hollis L. Webster, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

Peter Berkman, the former president of B&K Industries, Inc., was sued by B&K and its parent company, Mueller Industries, Inc. (collectively, Mueller), for breach of contract and breach of fiduciary duty relating to the formation of a competing company and to bribes and kickbacks that Berkman allegedly received from one of Mueller's primary suppliers. In response to Mueller's discovery requests for the production of documents, Berkman refused to produce various documents, asserting a privilege based on the fifth amendment and the attorney-client privilege. The trial court

rejected Berkman's assertions of privilege and granted Mueller's motion to compel production. In order to perfect an appeal, Berkman again refused to produce the documents and drew a finding of contempt. He now appeals the finding of contempt and the grant of the motion to compel. We affirm in part, reverse in part, vacate in part, and remand.

BACKGROUND

Berkman was one of the owners of B&K, a company that imported plumbing products from suppliers and sold the products to customers in the United States. Beginning in 1997, Berkman's attorney was David Shevitz, a partner at Katten, Muchin & Rosenman LLP (Katten). In 1998, B&K was bought by Mueller, a publicly owned manufacturer of plumbing fixtures and products. After the acquisition, Berkman continued to work for Mueller as the president of B&K. Katten, through Shevitz, continued to represent Berkman.

One of B&K's primary suppliers was Xiamen Lota International Co., Ltd. (Lota), a plumbing manufacturer specializing in valves and faucets. Lota's annual sales to B&K regularly exceeded $10 million. In April 2003, Lota USA, a limited liability company, was formed to serve as Lota's sales and marketing representative in the North American market. About the same time, Berkman formed Woodland Investment Partnership (Woodland), which acquired a 10% ownership interest in Lota USA. Berkman was the managing member of Woodland. Katten, through Shevitz, assisted Berkman in forming Woodland and Lota USA and advised Berkman regarding how to structure his ownership in light of his employment contract with Mueller. Katten, through Shevitz, also began representing Mueller in 2003 in connection with several intellectual property issues, a representation that continued through April 2006. Although it is not completely clear from the record, it does not appear that

Katten advised either Mueller or Berkman of any potential conflict in the dual representation. Berkman asserts that Katten billed him separately for the work that Shevitz performed for him.

Berkman did not inform Mueller about his interest in Lota USA. Copies of e-mails between the principals of Lota USA and Katten, relating to agreements entered into by Lota USA, suggest efforts to avoid identifying Berkman's interest. For instance, although a March 2003 memorandum initially identified Berkman as the owner of 10% of Lota USA, a later memorandum from May 2003 identified the owner of that interest as Woodland. Similarly, Berkman's name and position as agent for Woodland were removed from a May 2005 agreement between Lota USA and Woodland.

In late 2005, Mueller's previous written employment contract (which contained a non-compete agreement) with Berkman expired, and the parties entered into an open-ended employment agreement. Berkman continued to serve as the president of B&K. In March 2006, Berkman asked Shevitz to review Mueller's code of conduct that he had just received, which contained among other things provisions restricting (1) outside financial interests that might affect an employee's decisions, (2) the handling of business opportunities, and (3) competition with Mueller. About the same time, Berkman asked Shevitz to form a new limited liability company, eventually named Homewerks, to compete with Mueller. One month later, in April 2006, Berkman, ostensibly acting for Mueller, advised Katten that Mueller would be retaining a different firm for its intellectual property legal work. Katten continued to work with Berkman in setting up Homewerks and soliciting investors. In July or August 2006, Berkman resigned his position with Mueller and began working full time at Homewerks.

In July 2007, Mueller sued Berkman, alleging that he had breached his employment contracts and also breached his common-law fiduciary duty to Mueller. Mueller alleged that Berkman, through

his ownership interest in Lota USA, profited personally and at the expense of Mueller by acquiescing in Lota's efforts to overcharge Mueller for supplies. Mueller also alleged that Berkman received payments from Lota for his assistance in this scheme. Katten appeared on behalf of Berkman and filed an answer and counterclaim against Mueller and the individual members of its board of directors, alleging that the counterdefendants conspired to defame Berkman and interfere with Homewerks' relationships with its customers and suppliers.

The parties commenced discovery. A subpoena was issued to Northern Trust, seeking documents relating to bank accounts held by Berkman and Woodland. Berkman moved to quash the subpoena. The motion was denied, and Berkman did not seek further review of that denial. Mueller also requested that Berkman produce various documents dating from August 1998 (Mueller's acquisition of B&K) through the present. Berkman initially produced about 350 pages of documents, but objected to producing any others on the ground that they were irrelevant or were protected by the attorney-client privilege. Mueller moved to compel. The documents at issue include the following: documents relating to Berkman's communications with Lota and Lota USA; documents concerning the relationship and financial arrangements between Berkman and Lota and Lota USA; documents relating to the legal advice Berkman received from Katten about his relationship with Lota USA and the creation of Homewerks, during the time that Berkman was president of B&K; documents relating to the formation and organization of Lota USA and Homewerks; and documents relating to any other "side" businesses of Berkman's.

On May 7, 2008, Berkman testified in connection with an arbitration proceeding involving Lota USA and Nick Moss, a former Lota employee who began working for Mueller. Although Berkman and his attorney had spoken about the proceeding, the attorney was not present. Berkman

testified, among other things,: that: his attorney advised him that it was okay to own 10% of Lota USA and that such ownership would not conflict with his obligations under his employment contract with Mueller; that he believed that he could be fired if Mueller found out about Woodland's ownership interest in Lota USA; and that he had told Moss what his attorney had told him. Berkman also testified regarding a January 2005 wire transfer from Lota to Woodland of over $313,000, which he later explained was for recruiting and business consulting services he performed for Lota.

As noted, Berkman produced some documents, but objected to producing others on the ground that they were irrelevant or protected by the attorney-client privilege. In June 2008, shortly after Mueller moved to compel production of the requested documents, Katten ceased representing Berkman in the litigation and new counsel filed a substitute appearance. Berkman then responded to the motion to compel by asserting that he was entitled to decline to respond to the document production requests under the fifth amendment to the United States Constitution, although he had not objected to production on this ground in his initial discovery responses. Berkman did not identify in any manner the documents (or even the categories of documents) that he believed were protected by the fifth amendment privilege. Berkman also filed amended answers to written discovery, stating that he declined to provide any further answers to interrogatories or responses to document requests because he was "invoking his [f]ifth [a]mendment rights." The parties briefed the issues, and the trial court heard oral argument on September 24, 2008.

On October 3, 2008, the trial court issued a memorandum opinion and order granting the motion to compel. As to the attorney-client privilege, the trial court held that Katten's dual representation of Berkman and Mueller destroyed any claim of privilege:

"It is undisputed that Peter Berkman was a corporate officer with B&K Industries during the time that the law firm of Katten, Muchin represented both Berkman and Mueller/B&K from 2003 to 2006. Mr. Berkman cannot conceal from Plaintiffs communications between their own officer and their own attorneys. No attorney-client privilege exists under circumstances where the law firm represents both a corporate entity and a corporate officer at the same time, and the representation is arguably adverse. Common sense dictates that the corporate officer, knowing the existence of the law firm's representation, can have no expectation of confidentiality with counsel on matters germane to the corporation."

The trial court therefore held that the attorney-client privilege did not shield the documents requested.

Regarding Berkman's fifth amendment claim of privilege, the trial court noted that under the "act of production" doctrine, documents may be withheld only if the act of producing those documents would itself be testimonial and incriminating. The trial court noted that Berkman's contentions in support of his argument that the fifth amendment applied were very general, and he had failed to produce any type of privilege log or make any particularized identification of how the production of each document would be testimonial or incriminating. It therefore held that Berkman had failed to make the required threshold showing that the fifth amendment privilege applied. The trial court ordered the production of the above categories of documents.

Berkman moved for reconsideration, making essentially the same arguments as before, but also responding to the trial court's complaint that Berkman did not produce a privilege log of the documents he sought to shield under the fifth amendment privilege. Berkman argued that requiring him to produce a privilege log to Mueller would eviscerate the privilege, because part of what he was

entitled to protect was the very existence of responsive documents. Nevertheless, Berkman tendered a new privilege log of such documents for in camera review, and also offered to allow the trial court to examine the documents themselves in camera if the privilege log was not sufficient. The trial court denied the motion for reconsideration without taking the privilege log into account, because it was not persuaded that it had made an error of law in its earlier ruling and it did not believe that the contents of the privilege log would affect that ruling. At a later hearing, the trial court stated that it was also uncomfortable that the privilege log was tendered for ex parte review and that Mueller would not have the opportunity to view it.

In order to appeal the trial court's ruling, Berkman notified the trial court that it would not obey the court's order to produce the requested documents and asked to be held in contempt. On January 7, 2009, the trial court found Berkman in civil contempt of court and imposed a penalty of $1,000. Berkman filed a timely notice of appeal.

ANALYSIS

Berkman's appeal of the contempt order requires us to review the underlying discovery order. Cangelosi v. Capasso, 366 Ill. App. 3d 225, 227 (2006). On appeal, Berkman challenges the trial court's determination that neither the attorney-client privilege nor the fifth amendment privilege shielded the requested documents from discovery. Although discovery orders are generally reviewed for abuse of discretion, we review the trial court's determination of whether a privilege applies de novo. Cangelosi, 366 Ill. App. 3d at 227.

On appeal, Berkman has not identified which privilege he believes applies to each of the five outstanding document requests. It is possible that the two privileges apply to entirely separate groups

of responsive documents, or there may be some overlap. We therefore analyze the applicability of each privilege separately.

## A. Attorney-Client Privilege

Only one of the five document production requests at issue contains an obvious request for communications between Berkman and his attorneys (the request for all documents relating to the legal advice Berkman received from Katten about his relationship with Lota USA and the creation of Homewerks, during the time that Berkman was president of B&K). However, it is possible that documents responsive to the other production requests at issue may also involve communications between Berkman and Katten. The following analysis applies to all responsive documents as to which Berkman has claimed the attorney-client privilege.

Under certain circumstances, the attorney-client privilege shields communications between a lawyer and an existing or potential client from disclosure. However, as our supreme court has pointed out, this privilege has its limits and must be narrowly construed to avoid unnecessarily constricting the discovery process:

" 'The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information.' [Citation.] However, the privilege is not without conditions, and we are mindful that it is the privilege, and not the duty to disclose, that is the exception. [Citation.] Therefore, the privilege ought to be strictly confined within its narrowest possible limits. Further, the attorney-client privilege is limited solely to those communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such. [Citations.] Finally, we note

that in Illinois, we adhere to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." Waste Management, Inc. v. International Surplus Lines Insurance Co., 144 Ill. 2d 178, 190 (1991), quoting and citing Consolidation Coal Co. v. Bucyrus-Erie Co., 89 Ill. 2d 103, 117-18 (1982).

Berkman contends that the attorney-client privilege protects many of the documents sought by Mueller. Mueller responds that the attorney-client privilege does not apply for a variety of reasons, including Katten's dual representation of both Berkman and Mueller, the fiduciary-duty exception to the privilege, and the crime-fraud exception. We discuss each exception in turn.

### 1. Doctrine of Dual Representation

The trial court held that Katten's dual representation of both Berkman and Mueller during a time when Berkman was an officer of Mueller meant that, once the parties were adverse, neither party could have a reasonable expectation of confidentiality in its communications with Katten about any matter germane to Mueller's business. Under both Illinois law and foreign law cited by the parties, the trial court's reasoning is sound.

As noted, Illinois law limits the scope of the attorney-client privilege to "communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such." Waste Management, 144 Ill. 2d at 190; see E. Cleary, McCormick on Evidence §91 (3d ed. 1984). As applied to this case, the issue becomes whether, in seeking the legal advice, Berkman could reasonably believe under the circumstances that his communications with Katten would be confidential.

The answer to that question is not completely clear-cut. On one hand, Berkman had a previously existing relationship with Katten and may not have understood that Katten's representation of Mueller would compromise its ability to keep Berkman's communications confidential. Berkman first retained Katten to advise him in 1997, approximately a year before his company (B&K) was acquired by Mueller. Katten continued to represent Berkman on an individual basis[1] for approximately six years before it began performing corporate legal work for Mueller during the period from 2003 to 2006. Thus, Katten was Berkman's individual counsel prior to the start of the dual representation. The Illinois Rules of Professional Conduct required that before Katten could engage in dual representation of Berkman and Mueller it should have, at the very minimum, advised both Berkman and Mueller about the possibility of a conflict arising between them, explained the implications and limitations imposed by dual representation, and obtained the consent of both parties to the dual representation. 134 Ill. 2d R. 1.7(b). There is no indication in the record that Katten did so, however. Thus, the evidence does not establish that Berkman actually knew that his communications with Katten would not be confidential following the start of the dual representation. On the other hand, as the trial court pointed out, Berkman was well aware that in 2003 Katten began representing Mueller as well as him, and should reasonably have expected that Katten would owe the same duty of loyalty to both Mueller and him after that time. Moreover, Berkman knew that Katten's representation of him related to matters that would affect Mueller, because they involved Mueller's

---

[1]For the purposes of this analysis, we accept as true Berkman's assertion that he personally paid all of the bills for Katten's representation of him, both before and after Katten began doing legal work for Mueller. If, in fact, B&K paid the bills for Katten's representation of Berkman, either before or after Mueller's acquisition of B&K, that would affect our analysis.

business and its supplier Lota. Under the circumstances present here, we find that Berkman could not reasonably have believed that his communications with Katten would be confidential after the dual representation began in 2003. See Waste Management, 144 Ill. 2d at 190. Thus, under Illinois law, no attorney-client privilege applied to Berkman's communications with Katten after that point.

Our holding is limited to communications related to the business--plumbing supply--in which Mueller was engaged. We note that the only documents sought by Mueller are those related to Katten's advice to Berkman in this area. Mueller has not sought discovery of any communications between Berkman and Katten on other, purely personal legal matters.

Perhaps because of the dearth of Illinois case law addressing the situation in which a former corporate officer claims an attorney-client privilege over communications with the corporation's counsel, in their briefs on appeal both parties bypassed the Illinois "reasonable expectation of confidentiality" test and instead focused on a federal case that speaks more precisely to that situation, In re Bevill, Bresler & Schulman Asset Management Corp., 805 F.2d 120 (3d Cir. 1986). In that case, various corporate officers met with corporate counsel as the corporation was experiencing financial difficulties. After the corporation filed for bankruptcy, an affiliate was liquidated, and the SEC began civil and criminal investigations into the corporation's conduct, the various trustees sought discovery regarding the meetings between the corporate officers and the corporate counsel. The trustees, as the current representatives of the corporation, wished to waive any attorney-client privilege, and the former corporate officers resisted, claiming that the subject of their meetings with the lawyers encompassed both individual and corporate legal matters. The trial court held that the attorney-client privilege did not apply to the former officers' communications.

In affirming, the appellate court adopted a five-part test for determining whether a corporate officer may assert an individual attorney-client privilege as to communications with an attorney who also represented the corporation: (1) the officer must have approached the corporate counsel for the purpose of seeking legal advice; (2) the officer must have made it clear from the start that the officer sought advice in his or her individual capacity; (3) corporate counsel chose to advise the officer, despite knowing that a potential conflict could arise; (4) the officer's communications with counsel were confidential; and (5) the substance of the communications did not concern "matters within the company or the general affairs of the company." Bevill, 805 F.2d at 123.

Here, both parties seek to apply the Bevill test to this case, and focus their arguments on how it should be applied. Although the parties do not seriously contest that the first four elements of this test are met, they dispute whether the fifth prong is met. Berkman contends that it is met, arguing that his communications with Katten concerned only his own personal liability for his actions. In support, Berkman cites to In re Grand Jury Proceedings, 156 F.3d 1038, 1041 (10th Cir. 1998). That case involved the chief executive officer of a hospital that was the subject of a grand jury investigation. The officer sought to quash a subpoena served on the hospital on the grounds that some of the documents were privileged because they contained attorney-client communications between himself and the attorney for the hospital. The district court held that the privilege was inapplicable under the fifth prong of Bevill because the subject of the communications included matters within the general affairs of the company. The court of appeals took a more nuanced approach, holding that even where the overall subject of the communications related to corporate matters, the officer could claim an individual attorney-client privilege if he could show that the communications concerned only his own potential liability and not that of the corporation. In re

Grand Jury Proceedings, 156 F.3d at 1041. The court gave the example that a corporate officer's discussion of the jail time he faced would be protected, because his potential prison sentence would be "outside the scope of the corporation's concerns and affairs." In re Grand Jury Proceedings, 156 F.3d at 1041.

If we were to apply Bevill here, we would likely find that Berkman has not met the fifth prong of the test, because the substance of his communications with Katten was not "outside the scope of the corporation's concerns and affairs." There is no suggestion in the record that the communications requested here solely concerned Berkman's individual liability, or any other matter outside the scope of Mueller's corporate concerns and affairs. To the contrary, Mueller's document request seeks documents relating to the legal advice Berkman received from Katten about his relationship with Lota USA (a supplier to Mueller) and the creation of Homewerks (a competitor to Mueller), during the time that Berkman was a corporate officer of Mueller. On its face, this request focuses solely on communications that were about matters properly within the scope of Mueller's legitimate business concerns and not matters of individual liability. We also note that the courts applying Bevill have made it clear that the fifth prong is met only where the substance of the communications does not concern the corporation's affairs at all; when the communications involve both individual and corporate concerns, the officer's claim of an individual privilege cannot be sustained. See, e.g., In re Grand Jury Subpoena, 274 F.3d 563, 573 (1st Cir. 2001) (under fifth prong of Bevill, former corporate officers "may only assert an individual privilege to the extent that communications regarding individual acts and liabilities are segregable from discussions about the corporation" or its business concerns).

Although the Bevill test is particularized and relates more directly to the situation presented here, in which a former corporate officer seeks to assert an individual attorney-client privilege over communications with an attorney for the corporation, the Illinois Supreme Court has not yet adopted the Bevill test, and we see no need to do so in the first instance. In a case such as this, both the Bevill test and the "reasonable expectation of confidentiality" test yield the same result: where a corporate officer discussed matters related to the corporation's business with the corporation's attorney, he or she cannot shield those communications under the cloak of the attorney-client privilege. Under either test, Berkman's communications with Katten after the dual representation began in 2003 do not fall within the scope of the attorney-client privilege. If Berkman believes that any of the requested documents are outside this zone, because either the communications occurred before the dual representation began or they concerned purely personal legal matters, Berkman may submit to the trial court and Mueller a detailed list of such documents and the basis for the claim of privilege.

## 2. The Fiduciary-Duty Exception

Mueller also asks us to affirm the trial court's order on the basis of the fiduciary-duty exception to the attorney-client privilege. We find that, given the limited historical application of this exception, it is not clear that it applies here.

The fiduciary-duty exception arose in the context of trust law, and was historically based on the principle that the true owner of a trust is the trust's beneficiary, who possesses all of the legal rights associated with the trust and toward whom the trustee has a fiduciary duty. Accordingly, English common law held that "when a trustee obtained legal advice relating to his administration of the trust, and not in anticipation of adversarial legal proceedings against him, the beneficiaries of the trust had the right to the production of that advice." Wachtel v. Health Net, Inc., 482 F.3d 225, 231

(3d Cir. 2007). "The theory of the rule was that the trustee obtained the advice using both the authority and the funds of the trust, and that the benefit of [the] advice regarding the administration of the trust ran to the beneficiaries." Wachtel, 482 F.3d at 231. In essence, the beneficiary, not the trustee, was the true "client" of the attorney, and so was the real possessor of the attorney-client privilege. The beneficiary could therefore discover the communications between the attorney and the trustee without being subject to assertion of the attorney-client privilege.

In recent years, American courts have applied the fiduciary-duty exception in two situations outside of its original trust context: actions against ERISA fiduciaries and derivative shareholder suits. In the first situation, federal courts have held that beneficiaries of an employee-benefits plan have a right to discover the communications between plan fiduciaries and attorneys regarding the administration of the plan. See, e.g., Bland v. Fiatallis North America, Inc., 401 F.3d 779, 787-88 (7th Cir. 2005); United States v. Mett, 178 F.3d 1058, 1062 (9th Cir. 1999); In re Long Island Lighting Co., 129 F.3d 268, 272 (2d Cir. 1997). In the second situation, courts have held that corporate shareholders, as the true "owners" of a corporation, may under certain circumstances have the right to compel the managers of a corporation to disclose communications with attorneys about the affairs of the corporation. See Garner v. Wolfinbarger, 430 F.2d 1093, 1104 (5th Cir. 1970). However, courts have recognized that, in this application of the fiduciary-duty exception, there is a tension between the need of the shareholders to ensure that the corporation is not being run inimically to their interests and the need of corporate managers to run the corporation without constant supervision-by-litigation. Thus, courts generally require the shareholders to show good cause for breaching the privilege, taking into consideration among other things: the presentation of a colorable claim, evidence that the majority of shareholders (or the holders of the majority of the stock) support

the suit, the seriousness of the alleged corporate wrongdoing, the need for the requested documents and their availability through other means, and the extent to which the legal advice was in contemplation of the shareholder litigation itself. Garner, 430 F.2d at 1104; see also Fausek v. White, 965 F.2d 126, 130-31 (6th Cir. 1992); Ward v. Succession of Freeman, 854 F.2d 780, 786-87 (5th Cir. 1988).

The fiduciary-duty exception is limited by the requirement that the subject of the communications with the attorney was the ordinary affairs of the trust or corporation: if the communications concern the personal liability of the fiduciary or were made in contemplation of adversarial litigation, the exception does not apply. Mett, 178 F.3d at 1063-64; see Wachtel, 482 F.3d at 233. Given this limitation on the exception, it is doubtful whether the exception is applicable here, where Berkman's communications with Katten appear to have concerned actions that Berkman wished to take that could be adverse to Mueller's interests. We also note that, as with the Bevill test, Illinois has not yet adopted the fiduciary-duty exception. Under these circumstances, we decline to apply the fiduciary-duty exception. Instead, we turn to the remaining exception to the attorney-client privilege, which, in contrast to the foregoing exceptions, is well established in Illinois law.

### 3. Crime-Fraud Exception

The crime-fraud exception is a "major exception to the attorney-client privilege," and applies when a client seeks the services of a lawyer "in furtherance of criminal or fraudulent activity." In re Marriage of Decker, 153 Ill. 2d 298, 313 (1992). The rationale for this exception is that it is no part of a lawyer's professional services to assist in the commission of a crime or fraud, and advice given for those purposes would amount to participation in a conspiracy. Decker, 153 Ill. 2d at 313; Radiac Abrasives, Inc. v. Diamond Technology, Inc., 177 Ill. App. 3d 628, 634 (1988); see also 134 Ill. 2d

R. 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent").   "[W]here the crime-fraud exception applies, no attorney-client privilege exists whatsoever," and the communications at issue are not privileged.  Decker, 153 Ill. 2d at 313.  This exception applies to any communications made after the commencement of either the fraudulent activity or the preparations for that activity.

Good-faith consultation with an attorney regarding the legality of a possible course of action does not fall within the scope of the crime-fraud exception.  Thus, the primary issue in determining whether the exception applies is the intent of the client in seeking the attorney's services.  Radiac Abrasives, 177 Ill. App. 3d at 635.  In order to show that the crime-fraud exception applies, a party must demonstrate that, at the time of consulting the attorney, the client knew or should have known that the intended conduct was illegal.  Decker, 153 Ill. 2d at 314.  The party seeking the discovery may not rest merely on the allegations of the complaint, but neither must it establish a full-blown case of crime or fraud.  Instead, the party seeking discovery must make out a prima facie case, that is, " 'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.' "  Decker, 153 Ill. 2d at 322, quoting In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984).  Once the party seeking discovery has met this burden, the trial court may conduct an in camera inspection of the relevant documents to determine whether the communications were indeed in furtherance of a crime or fraud.  If so, production of the documents may be compelled.  Decker, 153 Ill. 2d at 321.

Here, Mueller has met its preliminary burden to establish a "reasonable basis to suspect" that Berkman was engaged in the perpetration or attempted perpetration of a fraudulent scheme when he sought Katten's services.  Although direct evidence of fraudulent intent is rare, circumstantial

evidence may give rise to an inference of such intent. Cincinnati Insurance Co. v. Guccione, 308 Ill. App. 3d 220, 226 (1999). The evidence assembled thus far suggests that, while serving as an officer of Mueller, Berkman (through Woodland) held an interest in one of Mueller's largest suppliers without disclosing that interest to Mueller. Berkman received at least one payment of over $300,000 from that supplier, again without disclosing the payment. At Berkman's request, Katten assisted Berkman in setting up his interest in Lota USA and in concealing the fact that Berkman held such an interest. While Berkman was still employed by Mueller (and while Mueller was one of Katten's own clients), Katten assisted Berkman in forming a competitor to Mueller. We find this a sufficient showing to meet Mueller's burden of raising a reasonable basis to suspect that Berkman knew or should have known that his intended conduct was fraudulent, and making a prima facie case that the crime-fraud exception to the attorney-client privilege therefore applies.

In so holding, we recognize that Mueller did not plead fraud per se against Berkman. Rather, it alleged breaches of fiduciary duty and contract. In concluding that an intentional breach of fiduciary duty may serve as the fraud necessary to establish the crime-fraud exception, we take note of Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476 (Ky. 1991). In that case, similar to this one, a corporation sued its former officer (among others) for breach of fiduciary duties in connection with the formation of a competing business. The evidence established that the officer had spent the final 11 months of his employment with the plaintiff quietly setting up the new company, soliciting investors, and wooing the plaintiff's customers. The Kentucky Supreme Court held that the breach of fiduciary duty was "on an equal par with fraud and deceit." Steelvest, 807 S.W.2d at 487. Several other courts have reached a similar conclusion. See Lane v. Sharp Packaging Systems, Inc., 2002 WI 28, ¶50, 251 Wis. 2d 68, ¶50, 640 N.W.2d 788, ¶50; Euclid Retirement Village, Ltd.

Partnership v. Giffin, No. 79840 (Ohio App. June 6, 2002) (unpublished decision); Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C., 107 Mich. App. 509, 519, 309 N.W.2d 645, 650 (1981).

We agree with this reasoning. There are parallels between fraud and the intentional breach of fiduciary duties. In this case, Berkman's silence regarding his own "side" business activities suggests an intent to deceive Mueller about his participation in those activities, in possible contravention of his fiduciary duty to share corporate opportunities with Mueller. A breach of fiduciary duties can be seen as a form of fraud in other contexts as well. For instance, when a fiduciary relationship exists, there is a presumption that any transaction between the parties in which the agent profits is fraudulent. Prodromos v. Everen Securities, Inc., 341 Ill. App. 3d 718, 724 (2003). Here, it is undisputed that Berkman owed Mueller a fiduciary duty, and Mueller has made out a prima facie case that Berkman nonetheless profited from a separate relationship with one of Mueller's suppliers, without Mueller's knowledge. Under these circumstances, we find that the intentional breaches of fiduciary duty alleged here were on a par with the level of fraud necessary to establish the crime-fraud exception.

Although we conclude that Mueller has made out a prima facie case that the crime-fraud exception applies, we cannot ourselves take the next step, which is to determine whether the individual documents that Berkman seeks to shield via the attorney-client privilege reflect an intent by Berkman to further a fraudulent scheme. The trial court is the appropriate court to make this determination in the first instance, which it may do through an in camera inspection of the allegedly privileged material. See Decker, 153 Ill. 2d at 324-25. If the documents reveal a fraudulent scheme, such as an intentional breach of Berkman's fiduciary duties, the crime-fraud exception will apply such

that "no attorney-client privilege exists" (Decker, 153 Ill. 2d at 313). We note that the crime-fraud exception, if it applies, will likely encompass a different time frame than the exception created by Katten's dual representation. The dual representation negates the privilege as to any communications occurring after Mueller began employing Katten. The crime-fraud exception would apply to all communications in furtherance of the fraudulent scheme, regardless of when they occurred: that is, any communications that took place between Berkman and Katten during the time when Berkman was employed by Mueller, relating to any breaches or planned breaches of Berkman's fiduciary duty toward Mueller.

In closing our analysis of the attorney-client privilege and its exceptions, we note that the various arguments advanced by Mueller--the doctrine of dual representation, the fiduciary-duty exception to the attorney-client privilege, and the crime-fraud exception--overlap to a great degree in cases such as this, in which a corporation (or its shareholders) sues a former corporate officer for breach of fiduciary duties.[2] We ultimately conclude that Mueller has made out at least a prima facie

---

[2]As a result, courts often cite to more than one of these doctrines to support their decisions. See Bevill, 805 F.2d at 125 (finding former corporate officers' communications with attorney who represented the bankrupt corporation discoverable on the basis of the dual representation, but also citing a crime-fraud justification, because recognizing the officers' individual attorney-client privilege would be contrary to the public policy in favor of uncovering insider fraud); In re Diasonics Securities Litigation, 110 F.R.D. 570, 575-76 (D. Colo. 1986) (applying primarily the fiduciary-duty exception but also the crime-fraud exception in holding that officers' communications with attorneys were not protected by the attorney-client privilege); Bailey v. Meister Brau, Inc., 55 F.R.D. 211, 213-14 (N.D. Ill. 1972) (noting that courts have found corporate managers' communications with attorneys

case that two of these exceptions may apply here, although we cannot conclusively find that the crime-fraud exception applies, nor can we rule on which documents are included within the exceptions. Those tasks we must leave to the trial court on remand. Given our conclusion, we need not address Mueller's argument that Berkman waived his attorney-client privilege by testifying at the May 2008 arbitration hearing.

B. Fifth Amendment Privilege

Although we have held that Berkman is not entitled to assert the attorney-client privilege over all the documents requested, that holding does not dispose of Berkman's separate claim that the fifth amendment privilege also protects from disclosure some or all of the documents sought by Mueller. We now turn our attention to that claim.

The fifth amendment to the United States Constitution provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In order to qualify for fifth amendment protection, a communication must be (1) compelled, (2) testimonial, and (3) incriminating. Fisher v. United States, 425 U.S. 391, 408, 48 L. Ed. 2d 39, 54, 96 S. Ct. 1569, 1579 (1976). The fifth amendment protects against both disclosures that could reasonably be used in a criminal prosecution and those that could lead to other evidence that could be so used. United States v. Hubbell, 530 U.S. 27, 38, 147 L. Ed. 2d 24, 37, 120 S. Ct. 2037, 2044 (2000). "A party who reasonably apprehends a risk of self-incrimination may claim the privilege even though no criminal charges are pending against him [citation] and even if the risk of prosecution is remote." 10-Dix Building Corp. v. McDannel, 134 Ill. App. 3d 664, 672 (1985). Although the controversy

---

discoverable by analogizing to the crime-fraud and fiduciary-duty exceptions, and relying as well on the dual-representation doctrine).

between the parties is a purely civil matter at this point, Berkman argues that the allegations in the complaint, if proven, could conceivably support a prosecution against him for mail fraud or wire fraud. See, e.g., United States v. Vrdolyak, 536 F. Supp. 2d 899 (N.D. Ill. 2008) (prosecution for mail and wire fraud arising from allegedly fraudulent private business dealings). The trial court did not address whether Berkman adequately established that he is subject to possible criminal prosecution for the acts alleged in the complaint, and we decline to rule on the issue in the first instance. If the parties wish to raise this issue on remand, they may do so. However, for the purposes of the following discussion, we assume without deciding that the allegations of the complaint could form a basis for criminal prosecution.

We begin by noting the general rule that the fifth amendment does not apply to documents. Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 55, 96 S. Ct. at 1581. That is because the fifth amendment does not protect a communication unless that communication is compelled, testimonial, and incriminating. Fisher, 425 U.S. at 408, 48 L. Ed. 2d at 54, 96 S. Ct. at 1579. Typically, when the communication being sought is a document, no compulsion was involved in its creation--the document was voluntarily prepared in accordance with the wishes or the usual custom of the person creating it. For this reason, documents generally are not protected from disclosure by the fifth amendment, regardless of whether their contents might be incriminating. In Fisher, the Supreme Court held that the fifth amendment did not shield the production of documents created by taxpayers' accountants:

> "[T]he Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communications. *** [Where] the

preparation of all of the papers sought in these cases was wholly voluntary, \*\*\* they cannot be said to contain compelled testimonial evidence, either of the taxpayers or of anyone else. The taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else." Fisher, 425 U.S. at 409-10, 48 L. Ed. 2d at 55, 96 S. Ct. at 1580-81.

Just as in Fisher, in this case the business records and other documents sought by Mueller were prepared voluntarily by Berkman and others without compulsion. Thus, the mere fact that the contents of the requested documents might tend to incriminate Berkman does not permit him to shield them from production on the basis of the fifth amendment privilege.

Under some circumstances, however, the production of documents itself constitutes a "statement" that may be privileged under the fifth amendment. The Supreme Court first enunciated this "act of production doctrine" in Fisher, stating, "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced." Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581. For instance, the act of producing documents requested in discovery may implicitly concede the existence of the documents, possession or control of the documents, and in some situations the authenticity of the documents. See Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581. As with any other statement, the "statement" made by producing requested documents is privileged under the fifth amendment only if it meets the three requirements for such protection: that is, the act of production itself is compelled, testimonial, and incriminating. Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 55, 96 S. Ct. at 1581; see also In re Marriage of Roney, 332 Ill. App. 3d 824, 827 (2002).

In almost every case in which this issue arises, the first requirement is met, as the production of the documents is being compelled by a discovery request, a court order, or a subpoena. In this case, the trial court entered an order compelling Berkman to produce the requested documents.

The evaluation of the remaining requirements for the privilege--is the act of production testimonial and incriminating?--is often more difficult, and depends on the facts of each case. Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581; see also In re Grand Jury Subpoena, Dated April 18, 2003, 383 F.3d 905, 909 (9th Cir. 2004) (In re 2003 Grand Jury Subpoena) ("Whether the act of production has a testimonial aspect sufficient to attract Fifth Amendment protection is a fact-intensive inquiry").

In some cases, where the items or documents requested are contraband or otherwise directly embody a violation of the law, it may be obvious that the act of production would be both testimonial and incriminating. For example, in Hubbell, 530 U.S. at 30, 147 L. Ed. 2d at 32, 120 S. Ct. at 2040, the mere existence (and Hubbell's possession) of the documents requested by the government was incriminating because Hubbell had previously promised, as part of a plea agreement in an earlier criminal proceeding, to provide the government with "full, complete, accurate, and truthful information," regarding certain subjects. The very existence and possession of the documents requested, which were documents that Hubbell had not given the government earlier, could subject Hubbell to criminal liability. Hubbell was therefore entitled to claim a fifth amendment privilege in response to the subpoena of the documents. Hubbell, 530 U.S. at 37, 147 L. Ed. 2d at 37, 120 S. Ct. at 2044. An Illinois case, Roney, is similarly illustrative. In that case, a wife sought to require her husband to turn over tape recordings he had made of telephone calls to her. The trial court ordered the husband to produce the tapes. The appellate court reversed and held that the husband

was entitled to assert a fifth amendment privilege over the tapes, because the very existence of the tapes was incriminating, as they were created in violation of the Illinois criminal law prohibiting eavesdropping (720 ILCS 5/14--2(a)(1) (West 2000)). It was not the content of the recorded conversations, but the fact that they existed at all, that was incriminating. Therefore, the husband could not be required to produce the tapes. Roney, 332 Ill. App. 3d at 828. In cases like these, in which the items requested are direct evidence of an illegal act, it is relatively clear that the fifth amendment protects a person from having to admit the existence of the items requested, either through answering questions about the items or by producing them.

The documents requested in this case do not fall into this category. Nothing about the mere existence or possession of the documents sought here is direct evidence of an illegal act. As various courts (including the trial court in this case) have pointed out, "it is not a crime to make a wire transfer, use the phone, or possess corporate records." Bear Sterns & Co. v. Wyler, 182 F. Supp. 2d 679, 684 (N.D. Ill. 2002); see also Fisher, 425 U.S. at 412, 48 L. Ed. 2d at 57, 96 S. Ct. at 1581 (the production of taxpayer's accountant's papers was not incriminating, because "it is not illegal to seek accounting help in connection with one's tax returns or for the accountant to prepare workpapers and deliver them to the taxpayer"). However, the Supreme Court has held that the fifth amendment may also protect against the compelled production of documents that are indirectly testimonial and incriminating.

In Fisher, the Supreme Court established that documents may be privileged from discovery by the fifth amendment if their production would give the requesting party knowledge that it did not previously have regarding: (1) the existence of the documents; (2) the producing person's possession or control of the documents; and (3), in some situations, the authenticity of the documents. See

Fisher, 425 U.S. at 410, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581. Here, Berkman argues that responding to the document requests would force him to concede the existence, possession, and authenticity of the documents, and that these admissions would be both testimonial and incriminating. We begin the analysis with the last argument, regarding authentication.

### 1. Authentication of the Documents

Berkman argues that requiring him to produce the requested documents would be testimonial and incriminating in that it would amount to authentication of the documents produced. Under Illinois law, however, the production of documents in response to discovery requests does not, in and of itself, authenticate those documents so as to permit the use of the documents at trial. Complete Conference Coordinators, Inc. v. Kumon North America, Inc., 94 Ill. App. 3d 105, 107 (2009); see also CCP Ltd. Partnership v. First Source Financial, Inc., 368 Ill. App. 3d 476, 484 (2006). Although Supreme Court Rule 216(b) (134 Ill. 2d R. 216(b)) permits a party to serve requests to admit the genuineness of documents on another party, the record does not reflect that any such requests were served in conjunction with the document production requests at issue. Moreover, most of the documents requested are communications with or records of third parties such as Lota, Lota USA, Katten, and Homewerks. Such documents could be independently authenticated by those third parties. Although Berkman argues that some courts have held that the act of production is a testimonial confirmation of authenticity, Berkman has failed to demonstrate how, under Illinois law and under these circumstances, the production of the requested documents would amount to testimonial and incriminating authentication of the documents.

### 2. Existence and Possession of the Documents

A more difficult issue is posed by Berkman's claim that responding to the document requests would force him to concede that certain documents exist and are in his possession, and that this concession would be both testimonial and incriminating. The admission that responsive documents exist and are in the possession or control of the responder may or may not be "testimonial." The Supreme Court has held that if the existence of the requested documents is a "foregone conclusion" and the production of the documents therefore "adds little or nothing" to the knowledge of the other party, the fifth amendment is not implicated, because "[t]he question is not of testimony but of surrender." Fisher, 425 U.S. at 411, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581. The requesting party is not required to have "actual knowledge of the existence and location of *** every responsive document." In re 2003 Grand Jury Subpoena, 383 F.3d at 910. However, if the requesting party needs "the respondent's assistance both to identify potential sources of information and to produce those sources" (Hubbell, 530 U.S. at 41, 147 L. Ed. 2d at 39, 120 S. Ct. at 2046), the response is testimonial. When the requesting party does not know whether the requested documents exist, it may not "compensate for its lack of knowledge by requiring the [responding party] to become, in effect, the primary informant against himself." In re Grand Jury Empanelled March 19, 1980, 680 F.2d 327, 335 (3d Cir. 1982), aff'd in part & rev'd in part, 465 U.S. 605, 79 L. Ed. 2d 552, 104 S. Ct. 1237 (1984) (Doe).

The case law sheds a limited amount of light on the practical application of this "foregone conclusion" doctrine. At the one extreme are cases in which the party requesting the documents (typically, the government) clearly knows about the documents' existence in advance because the responding party has previously admitted the documents' existence and their whereabouts. See, e.g., United States v. Teeple, 286 F.3d 1047 (8th Cir. 2002); In re Grand Jury Subpoena Duces Tecum,

Dated October 29, 1992, 1 F.3d 87 (2d Cir. 1993) (In re 1992 Grand Jury Subpoena); United States v. Rue, 819 F.2d 1488 (8th Cir. 1987). Other means short of a confession by the producing party may also suffice to show that the requesting party already knew of the existence of the requested documents with "reasonable particularity" before it issued the request. For example, in United States v. Ponds, 454 F.3d 313, 325 (D.C. Cir. 2006), the court held that the government had shown prior knowledge of the existence of (1) correspondence to which the government was a party and (2) documents relating to the payment of legal fees under an attorney's retainer agreement, because that agreement had already been obtained by the government. Similarly, the requesting party can meet its burden to show prior knowledge of the requested documents' existence if the requested documents are referred to in documents that the requesting party already has, or the requesting party can identify some person (for instance, an accountant or a spouse) who is able to testify that the requested documents exist and were in the possession of the producing party on a reasonably recent date. See generally 3 W. LaFave, J. Israel, N. King & O. Kerr, Criminal Procedure §8.13(a), at 333-34 & nn. 25-28 (3d ed. 2007) (hereinafter LaFave). At the other extreme is the "quintessential fishing expedition" in which the requesting party clearly had no idea whether the documents existed prior to making the document request. See, e.g., Hubbell, 530 U.S. at 32, 147 L. Ed. 2d at 33, 120 S. Ct. at 2041; People ex rel. Bowman v. Woodward, 63 Ill. 2d 382, 387 (1976) (defendant could not be compelled to produce results of tests that the government otherwise had no knowledge of, which the defendant did not seek to use at trial). The Supreme Court has also rejected the argument that a document's existence is a foregone conclusion merely because the responding party is engaged in a business in which it would be customary to create or maintain documents of the type requested. Hubbell, 530 U.S. at 45, 147 L. Ed. 2d at 41, 120 S. Ct. at 2048 (the government could not meet its

burden to show prior knowledge of the documents' existence "through the overbroad argument that a businessman such as respondent will always possess general business and tax records that fall within the broad categories described in this subpoena").

Here, the parties dispute whether Mueller already knows, from other sources, that the requested documents exist. Berkman points to statements made by Mueller's attorney in oral argument, in which the attorney repeatedly indicated that because of the breadth of Berkman's assertion of the privilege, Mueller did not know whether individual documents that might be responsive to its document requests, such as a list of Lota's payments to Berkman, existed. However, Fisher and Hubbell do not require that a document request describe in detail "every scrap of paper" it seeks to obtain. Ponds, 454 F.3d at 325. What trouble us more than the failure to name each document sought are the broad categories of items sought in the document requests at issue. In general, the broader the request, the harder it is for the requesting party to establish that it already knows that the documents requested exist. As the court commented in In re 2003 Grand Jury Subpoena, 383 F.3d at 911, "A subpoena such as this, which seeks all documents within a category but fails to describe those documents with any specificity indicates that the government needs [the 'testimony' provided by] the act of production to build its case."

Nevertheless, the record indicates that Mueller already has access to documents that may enable it to prove that it already knows about the existence of the various documents that it has requested. For instance, Mueller has already obtained, through other sources, bank records of Berkman and Woodland showing transactions related to Lota and Lota USA, and a record of a wire transfer from Lota to Woodland for over $313,000. Mueller also has e-mails relating to the formation and management of Woodland and Lota USA, and statements made by Berkman relating to the

formation of Lota USA and Homewerks and Berkman's participation in decisionmaking related to the prices charged by Lota for products sold to Mueller. Thus, it is by no means clear that Mueller cannot establish its prior knowledge of the documents "with reasonable particularity." See In re 1992 Grand Jury Subpoena, 1 F.3d at 93 (setting out the rule that a person may not refuse to produce documents if the requesting party " 'can demonstrate with reasonable particularity that it knows of the existence and location of [the requested] documents' "), quoting In re Grand Jury Subpoena Duces Tecum Dated November 13, 1984, 616 F. Supp. 1159, 1161 (E.D.N.Y. 1985); 3 LaFave, Criminal Procedure §8.13(a), at 339-40 (3d ed. 2007) (noting that although the Supreme Court has not explicitly adopted the "reasonable particularity" standard, its use is widespread in lower courts).

This dispute is not one that we can resolve on the current record. In this regard, we disagree with the trial court's refusal to engage in an in camera review of the disputed documents. Our supreme court has stated that in camera reviews represent "a sensible solution" to the problem of how to evaluate a claim of privilege without revealing the privileged material to the party seeking it, thereby rendering the privilege worthless. Decker, 153 Ill. 2d at 324. In this case, we are sympathetic to the trial court's view that in camera review was unjustified because Berkman put forward too little too late to support his claims of a fifth amendment privilege. Berkman's initial claims of the privilege were sweeping and did not provide the information necessary for the trial court to evaluate his claims. Nevertheless, "[t]he right against self-incrimination is one of the most fundamental rights under the Constitution of the United States" (CHB Uptown Properties, LLC v. Financial Place Apartments, LLC, 378 Ill. App. 3d 105, 108 (2007)), and courts must therefore take great care to preserve that right when necessary. The trial court therefore erred in refusing to review the disputed documents in camera after Berkman offered, during the hearing on the motion for

reconsideration, to submit the documents for such an inspection. The trial court's refusal appears to have been premised in part on the ex parte nature of such a review, in which Mueller would not be permitted to know what Berkman submitted for review. However, when evaluating an assertion of the fifth amendment privilege, ex parte review of the evidence is frequently appropriate or even necessary in order to ensure that the privilege is not lost in the process of determining whether it applies. See Hoffman v. United States, 341 U.S. 479, 486, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818 (1951) (cautioning that, in establishing his claim to the fifth amendment privilege, a witness should not be "compelled to surrender the very protection which the privilege is designed to guarantee").

We therefore remand with instructions to conduct an in camera review of the documents in order to determine which of them, if any, are protected by the fifth amendment privilege because their production would be testimonial--that is, it would concede the existence of a document that was previously unknown. In order to engage in such a review, the trial court will not only need Berkman to produce, in camera, the documents as to which he asserts this privilege (or, if they are voluminous, a privilege log containing a highly detailed description of each document); the trial court will also need a submission from Mueller, in which it describes with reasonable particularity the documents that it seeks and the basis for its knowledge that those documents exist. The trial court may also seek or accept any other material that it believes will aid its determination. The trial court can then compare Mueller's present knowledge of the requested documents with those documents themselves. Any documents that Mueller establishes it already knew about with reasonable particularity must be produced, as their production would not be "testimonial" and therefore would not be protected under the fifth amendment.

As for those documents that the trial court determines were previously unknown and whose production would therefore be testimonial, the trial court must proceed to the third prong of the inquiry: determining whether the act of producing these documents would also be incriminating. We admit plainly that the proper scope of a trial court's analysis in this regard is somewhat ambiguous under the current state of the case law. On the one hand, Fisher advocated an approach that ignores whether the documents' content is incriminating and looks only to whether some aspect of the production itself is incriminating. Roney, in which the very existence of the husband's tapes of his ex-wife's telephone conversations would be incriminating, is an example of a case in which the act of production itself would tend to incriminate a party. On the other hand, in Hubbell the Supreme Court appears to have looked to the contents of the documents produced by the defendant in finding that the "incriminating" prong of the three-prong test was met, despite the Court's references to Fisher. See Hubbell, 530 U.S. at 31, 147 L. Ed. 2d at 33, 120 S. Ct. at 2041 (noting that "[t]he contents of the documents produced by respondent provided the Independent Counsel with the information that led to this second prosecution"); see also 3 W. LaFave, Criminal Procedure §8.13(b), at 348-49 (3d ed. 2007) ("If there was any doubt *** that potential content could be considered" when evaluating whether the production of requested documents would be incriminating, "it was put to rest by Hubbell"). Faced with these divergent approaches, at least one commentator has suggested that each approach is useful in different kinds of cases. In some cases, where the existence of the documents or other items requested is not at issue (as in Fisher), a court must look to whether the act of producing those documents is somehow incriminating. However, where the very existence of the documents is the primary question (as it was in Hubbell), a court may look to the contents of the documents in determining whether their production would be incriminating and would therefore

violate the fifth amendment. See R. Mosteller, Cowboy Prosecutors & Subpoenas for Incriminating Evidence: The Consequences & Correction of Excess, 58 Wash. & Lee L. Rev. 487, 541 (Spring 2001); see also R. Mosteller, Simplifying Subpoena Law: Taking the Fifth Amendment Seriously, 73 Va. L. Rev. 1, 26-27 (February 1987) (when the issue is whether the requested documents exist, "the fifth amendment is violated if the act of production is testimonial because the government would be ignorant of the existence of such incriminating documents but for the act of production").

We agree that each of these approaches may be useful in various circumstances. Thus, a trial court faced with the determination about whether production would be incriminating may consider either approach. If either approach indicates that production would be incriminating--some aspect of the production itself would be incriminating, or the production would provide the requesting party with incriminating documents whose existence was unknown--then the fifth amendment protects against such compelled production. In any individual case, however, the touchstone remains whether, in that particular case, the producing party is in essence being compelled to build the government's case against that party, rather than simply turn over evidence of wrongdoing about which the government already knows. See Doe, 680 F.2d at 335 (the responding party cannot be compelled to "become, in effect, the primary informant against himself").

Regardless of how the trial court ultimately rules on remand, we urge it to provide a reasonably detailed explanation of that ruling. Indeed, in light of the likelihood of additional appeals from this litigation, it is essential that the trial court make a detailed record of its findings with respect to each document or group of documents. In addition, should Mueller gain additional independent information relating to documents that were initially withheld on the grounds that they were unknown and therefore privileged, it may seek anew the production of those documents through the same

methods outlined here. Finally, should the threat of criminal prosecution diminish, for instance through the expiration of the applicable statute of limitations, Berkman's assertion of the privilege will likewise be called into question. At this point, however, we cannot say that Berkman's assertion of the fifth amendment privilege is untenable.

CONCLUSION

In sum, the requested documents were not protected by the attorney-client privilege insofar as they fell within the period of Katten's dual representation of Berkman and Mueller, or contain communications between Berkman and Katten that fall within the crime-fraud exception. Accordingly, the trial court did not err in granting Mueller's motion to compel as to documents withheld solely under that privilege that were created within (or contain communications that occurred within) the period of dual representation. The crime-fraud exception may also permit the discovery of other attorney-client communications that occurred outside of that period, but the trial court must make that determination in the first instance. As to the documents withheld pursuant to Berkman's claim of the fifth amendment privilege, we remand the case to the trial court with instructions to conduct an in camera review as set forth above.

We also vacate the trial court's contempt order against Berkman. "Where a party's refusal to comply with a trial court's order constitutes a good-faith effort to secure an interpretation of the *** privileges in question, it is appropriate to vacate a contempt citation on appeal." Cangelosi, 366 Ill. App. 3d at 230. It is undisputed that Berkman's refusal to comply with the trial court's order was a good-faith effort to obtain review of the discovery order. We therefore vacate the contempt order entered by the circuit court of Du Page County against Berkman and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and vacated in part; cause remanded.

JORGENSEN, J., concurs.

JUSTICE O'MALLEY, specially concurring:

The majority holds that Katten's dual representation of Berkman and Mueller meant that Berkman could not have a reasonable expectation of confidentiality in its communications with Katten. I disagree. As the majority makes clear in other parts of its opinion, "Berkman's communications with Katten appear to have concerned actions that Berkman wished to take that could be adverse to Mueller's interests" (slip op. at 16) and, "[a]t Berkman's request, Katten assisted Berkman in setting up his interest in Lota USA and in concealing the fact that Berkman held such an interest" (slip op. at 18). Under those facts as the majority states them, there should be no question but that Berkman engaged Katten on these matters with the expectation that they would not be disclosed to Mueller. It therefore puzzles me to see the majority's conclusion, preceded by a recitation of the parties' positions but no analysis as to which is the stronger position, that "Berkman could not reasonably have believed that his communications with Katten would be confidential." Slip op. at 11.

The majority takes this contradiction one step further when it discusses the Bevill test created to determine whether corporate officers got their legal advice "in their role as corporate officials," so that they should not expect their communications to be kept confidential from the corporation, or for "matters not related to their role as officers of the corporation," so that they should expect confidentiality. Bevill, 805 F. 2d at 125. The majority states that "[t]here is no suggestion in the record that the communications requested here solely concerned Berkman's individual liability, or any other matter outside the scope of Mueller's corporate concerns and affairs" and that, "[t]o the

contrary, Mueller's document request seeks documents relating to the legal advice Berkman received from Katten about his relationship with Lota USA (a supplier to Mueller) and the creation of Homewerks (a competitor to Mueller)." Slip op. at 13. (Incidentally, by the vague phrase "his relationship with Lota USA (a supplier to Mueller)," the majority describes a relationship allegedly created to allow Berkman to siphon kickbacks and bribes relating to Mueller's relationship with Lota USA.) I struggle to understand how an attorney's helping a corporate officer conceal a kickback and bribe scheme with a supplier and set up a competitor to the corporation can be deemed within the corporation's concerns and affairs, so that the officer should expect the corporation to be privy to the advice. In any event, in its discussion of the dual-representation issue, the majority's characterization of the nature of Berkman and Katten's communications is diametrically opposite its characterization of those communications in the remainder of the opinion.

If the majority means to imply that the fifth prong of the Bevill test--whether the communications concerned "matters within the company or the general affairs of the company" (Bevill, 805 F. 2d at 123)--should be read to encompass any communications that have any effect whatsoever on the company, including even communications on matters intentionally withheld from the company, then the majority has read the prong so broadly that it has untethered the Bevill test from its purpose. As I have said, the Bevill test seeks to determine whether the corporate officer who obtained the advice was acting in his role as a corporate officer. A corporate officer organizing a competitor, and concealing a scheme of kickbacks and bribes, is acting decidedly outside his official role. Further, his scheme would quite obviously depend on his corporation's not being apprised of his activities. He would therefore receive advice on those matters with the expectation that the advice would be kept confidential from the corporation. Accordingly, under either the Illinois test or the

<u>Bevill</u> test, the fact that Katten represented both Berkman and Mueller does not mean that Berkman should not have expected Katten's advice to him personally to be kept confidential.

Although the majority deviates from this understanding of Berkman's actions in its discussion of the dual-representation issue, it characterizes his actions correctly (albeit inconsistently) in its discussion of the fiduciary-duty and crime-fraud exceptions to the attorney-client privilege. I therefore agree with the majority that, although the fiduciary-duty exception does not apply, this matter must be remanded for an <u>in camera</u> inspection to determine the applicability of the crime-fraud exception as well as the fifth amendment privilege.